J-A26009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DANA L. NEWBY, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | | |
| v. | | |
| DAVID D. NEWBY, | | |
| Appellant | | No. 427 MDA 2014 |

Appeal from the Order Entered February 27, 2014
In the Court of Common Pleas of York County
Civil Division at No(s): 2012-FC-847-15

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 15, 2014**

David D. Newby ("Husband") appeals from the February 27, 2014 order denying his petition seeking enforcement of a marriage settlement agreement ("MSA").  Specifically, he asked the court to order Dana L. Newby ("Wife") to pay him his one-half share of the equity in the marital home.  After review, we reverse and remand for proceedings consistent herewith.

The following facts are relevant to our disposition.  The parties entered into an MSA dated and effective November 8, 2011.  The parties subsequently divorced on January 20, 2012, but the MSA did not merge into the decree.  Article 1 § 1.01(a) of the MSA governed the couple's marital home, and provided in pertinent part:

> (a)    107 Meadow Hill Drive, Windsor Township, York County, Pennsylvania

(i) VALUATION: At the time this Agreement was prepared, David and Dana believed that the fair market value of this real property and residence was equal to or less than the principle (sic) balance of their mortgage and home equity loan. David and Dana elected not to have the value of this real property and residence determined at the time this Agreement was prepared. Instead, the value of this real property and residence shall be determined by sale or appraisal at a later time. Pending the distribution of this real property and residence as set forth below, neither David nor Dana shall do or allow anything that would reduce the fair market value of this real property and residence.

(ii) OWNERSHIP: David and Dana owned this real property and residence at the time this Agreement was signed. Neither Dana nor David shall transfer any interest in this real property and residence other than through the distribution or alternate distribution described below.

. . . .

(v) DISTRIBUTION: David and Dana share a goal of holding this real property and residence for a period of about two years while they pay down their mortgage and home equity loans (and hope that market conditions increase the value of their home) to a point where this real property and residence may be sold without incurring a significant financial loss. Exactly two years after David and Dana sign this Agreement (sooner if both David and Dana agree) this real property and residence shall be listed for sale with a Realtor. It shall remain listed for sale through a Realtor until sold. The marketing goal shall be a prompt sale for an amount sufficient to pay all expenses of sale. Any and all net proceeds of sale, and any escrow refunds, shall be distributed promptly between David and Dana in equal shares. Any closing costs, short sale fees, and sums required to be paid at time of settlement to complete sale and transfer marketable title shall be paid promptly by

- 2 -

David and Dana in equal shares—however under no circumstances shall this real property and residence be listed or sold for an amount that would require either David or Dana to pay more than five thousand dollars ($5,000) out of pocket to complete the sale (the only exception being if either Dana or David expressly agrees to pay more than this amount in order to obtain a prompt sale).

(vi) ALTERNATE DISTRIBUTION: After the two year "holding period" mentioned in the preceding subsection of this agreement, Dana or David may "buy out" the other's interest. The buyout amount shall be one-half of the equity (appraised value at that time minus remaining balance of the mortgage and home equity loans at that time). The expense of the appraisal shall be paid by whomever is buying-out the other person's share. The buyout payment shall be paid no later than ninety (90) days after notice of intention to buy out the other's interest is given. After receiving the buyout payment, the person whose interest is being bought out shall vacate this real property and residence within thirty (30) days of payment or sixty (60) days of notice of buyout (whichever is more). The deed to this real property and residence shall be transferred to the person who is buying-out the other's interest, but not until the person whose interest is being bought out is completely removed from all legal liability on the mortgage and home equity loans. Additionally, the person who buys out the other's interest in the home shall promptly pay the other a portion of any excess proceeds of sale of this real property and residence as follows:

> 1. If this real property and residence is sold within one year of the buyout payment mentioned above, fifty percent (50%) of any portion of net proceeds from sale that exceed the equity per appraisal mentioned above.

> . . . .

- 3 -

Marital Settlement Agreement, 11/8/11, at 2-5. The MSA also provided that the agreement could be modified only in a writing signed and acknowledged by the parties before a notary public and that the agreement was not subject to modification by the court. *Id*. at § 6.03(a) and (b).

The following facts were developed at the February 6, 2014 hearing on Husband's petition seeking specific enforcement of the MSA's provisions regarding the parties' marital home. The parties continued to reside in the marital home and share the expenses even after the divorce decree was entered. In February or March of 2013, they discussed the sale of the house, or alternatively, one staying in the house and buying out the other. Husband told Wife that a real estate agent whom he consulted estimated that their home would sell for a price between $209,000 and $220,000, and that they likely would have to pay up to $10,000 in closing costs. When Husband subsequently advised Wife that he did not want to stay in the house, Wife sought refinancing in her name alone. The house appraised at $300,000, a fact that Wife did not communicate to Husband. The mortgage payoff was $214,203.35.

At settlement on April 24, 2013, Wife paid off the existing liens on the property with the proceeds of a new loan for $201,465, and $20,756.65 in cash, most of which she obtained from her parents. Husband executed the deed transferring his one-half interest in the marital home to Wife. That night, Husband asked Wife for his share of the equity in the house. Wife told

- 4 -

him he would not be getting anything since he decided to abandon the property. Husband subsequently moved out of the property in June 2013, and sought specific enforcement of the MSA in January 2014.

At the hearing, Wife introduced the settlement sheet, the signed deed, and a second appraisal of the marital home dated January 2014, retrospectively valuing the property as of March 2013 at $255,000. It was her position that, although there was equity in the property, Husband was entitled to nothing. Alternatively, if the court were to determine that she owed him half the equity in the home, the amount should be based on the second estimate of $255,000, rather than the bank's appraisal of $300,000.

The trial court credited Wife's testimony and concluded, "Husband waived or relinquished the right to now compel Wife to buy out his interest in the marital residence based on the bank refinancing appraisal. If Husband thought he was due money pursuant to the MSA because Wife got an appraisal to refinance, he could have voiced his claim. He did not have to sign the deed as he did." Trial Court Opinion, 4/30/14, at 7. Furthermore, the court found that there was nothing to gain from the settlement as Wife was required to contribute an additional $20,000 in cash to refinance the home.

Husband timely appeals and presents three questions for our review:

1. Did the trial court err as a matter of law and abuse its discretion in determining that Appellant (hereinafter

"Husband") waived his right to payment of one-half of the equity in the marital real estate?

2. Did the trial court err as a matter of law and abuse its discretion by modifying the terms of the parties' marital settlement agreement?

3. Did the trial court err as a matter of law and abuse its discretion by "interpreting" the parties' agreement as well as their conduct so as to effect a waiver of the "buyout" provisions of their marital settlement agreement?

Appellant's brief at 7.

We review the trial court's decision refusing to enforce the MSA for an error of law or an abuse of discretion. *Tuthill v. Tuthill*, 763 A.2d 417, 419 (Pa.Super. 2000). The marital settlement agreement at issue, which did not merge into the divorce decree, "survives as an enforceable contract [and] is governed by the law of contracts." *Morgan v. Morgan*, 2014 PA Super 176 (Pa.Super. 2014). Since contract interpretation is a question of law, we are not bound by the trial court's interpretation. *Stamerro v. Stamerro*, 889 A.2d 1251, 1257 (Pa.Super. 2005). Our standard of review is *de novo* and the scope of our review is plenary. *Kripp v. Kripp*, 849 A.2d 1159, 1164 n.5 (Pa. 2004). However, we are bound by the trial court's credibility determinations. *Wade v. Huston*, 877 A.2d 464 (Pa.Super. 2005).

There is no dispute that the MSA provided the marital home would be sold after two years, or earlier if the parties agreed, and the equity split equally between Husband and Wife. Alternatively, one party could buy out

the other by paying one-half of the appraised value after satisfying any amounts owing on the mortgages. Wife maintained, however, that Husband told her he wanted out. She "understood that to mean that he wanted to move out, and that if I could get the refinance, that the house was mine." N.T., 2/6/14, at 29.

Husband maintains that he and Wife discussed the options: selling the house and splitting the proceeds, and one person staying in the house and buying out the other. Wife ultimately decided to refinance and stay in the home. Husband contends first that he did not waive his right to share in the equity of the marital home and that his conduct did not evidence any intent to modify the MSA. Furthermore, Husband claims that any waiver or modification to the MSA had to be in writing to be enforceable. Moreover, Husband maintains that the fact that he signed the deed and did not demand payment at the settlement did not constitute waiver of his right to the equity in the home under the MSA. According to the MSA, Wife had ninety days from the date she indicated her intent to buy out Husband to pay him his one-half of the equity in the house.

Wife's position is that Husband waived his right to the equity in the marital home by his conduct or, alternatively, that his signature on the deed at settlement constituted a sufficient writing to modify the MSA terms, and that his release from liability on the mortgages was sufficient consideration for the transfer of the property. She also claims that a refinancing and a

buyout are two different things, and that there were no proceeds to distribute to Husband at settlement.

The standard of enforceability of a contractual agreement is clear: "[a]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." **Crispo v. Crispo**, 909 A.2d 308, 313 (Pa.Super. 2006) (quoting **McMahon v. McMahon**, 612 A.2d 1360, 1363 (Pa.Super. 1992)) (citations omitted). Thus, the trial court may interpret a marital settlement agreement like a contract, but it has "neither the power nor the authority to modify or vary the decree unless there is conclusive proof of fraud or mistake." **Bianchi v. Bianchi**, 859 A.2d 511, 515 (Pa.Super.2004). As with contracts generally, the court must ascertain the intent of the parties when interpreting a contractual agreement. **Kripp**, **supra** at 1163. When the language of such an agreement is clear and unambiguous, this Court need only examine the writing itself to give effect to the parties' understanding. **Lang v. Meske**, 850 A.2d 737, 739-41 (Pa.Super. 2004).

Our Supreme Court reiterated in **Nicolella v. Palmer**, 248 A.2d 20, 23 (Pa. 1968), however, that "[p]arties to an agreement may rescind or abandon it." This can be demonstrated by parol evidence. **Wagner v. Graziano Const Co.**, 136 A.2d 82, 84 (Pa. 1957). Even where the written contract prohibits a non-written modification, our High Court held in **Wagner** that it may be modified by subsequent oral agreement. Proof of

- 8 -

oral modification of a written contract may be expressed in words or inferred from the acts and declarations of the parties. However, "where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence, as in cases where fraud, accident, or mistake is alleged." **Nicolella**, **supra** at 23; **see also Empire Props. v. Equireal, Inc.**, 674 A.2d 297 (Pa.Super. 1996) (an agreement prohibiting non-written modification may be modified by a subsequent oral agreement if the parties' conduct clearly shows an intent to waive the requirement that amendments be in writing).

We have reviewed the record and conclude that it does not support the trial court's determination that Husband waived or abandoned his claim to one-half of the equity in the marital home. Wife's initial waiver claim was based on Husband's statement, "I want out ASAP." N.T., 2/6/14, at 27. Mindful that the trial court believed Wife's version of the events, and deferring to that credibility determination as we must, **Wade**, **supra**, we fail to see how this statement constitutes the clear, precise, and convincing evidence that Husband waived or abandoned his equity interest in the property. Nor do we find waiver based on Husband's alleged failure to tell the settlement company about the MSA or provide a copy. Husband was not dealing with the settlement company and had no obligation to assert a claim

at settlement. Wife was contractually obligated under the MSA to pay him within ninety days of declaring her intention to buy him out. At the time of settlement, that ninety-day period had not run. It is undisputed that Husband made a demand for his share of the equity in the home the night of the settlement and Wife refused that request.

Nor do we agree that Husband's execution of the deed was legally sufficient to constitute a written modification of the MSA. The MSA contemplated that one spouse could buy out the other. Upon being relieved of financial obligation, the selling spouse was required to execute the documents necessary to facilitate that transfer. Husband's signature on the deed was consistent with his contractual obligations under the MSA, not evidence of any modification to that agreement.

Furthermore, we find no merit in Wife's position, adopted by the trial court, that the refinancing of the property and Husband's signing of the deed transferring his rights in the property to Wife was not a buyout as that term was used in the agreement. Refinancing was the means to effectuate the buyout and fully consistent with the alternate distribution option in the agreement. Husband, upon being relieved of financial responsibility for liens on the property, was required to execute the deed to transfer the property to Wife. The MSA only provided for two means of disposing of the property: sale to a third person or a buyout by one of the spouses. In addition, the parties agreed that neither could "transfer any interest in this real property

- 10 -

and residence other than through the distribution or alternate distribution" set forth in the MSA. MSA, at Article 1 § 1.01(a)(ii). The disposition was entirely consistent with the alternate distribution provisions of the MSA, with the exception that Wife refused to pay Husband his one-half share of the equity.

Nor do we find support for the trial court's conclusion that since there was nothing to distribute to Husband, he was not entitled to anything. The MSA provided that Husband was entitled to one-half of the equity in the home, as determined by an appraisal, minus the outstanding liens on the property. The bank's appraisal reflected a value of $300,000; liens totaled $214,203.35. Thus, there was approximately $85,000 in equity in the property, one-half of which belonged to Husband. Wife's failure to seek and/or secure sufficient funds to satisfy both Husband's share of the equity and the liens does not relieve her of the contractual obligation to pay Husband. Thus, we conclude that Husband is entitled to specific performance of the MSA regarding disposition of the marital home.

The record contains two appraisals of the property, one obtained by the bank at the time of the refinancing, and the other secured by Wife in anticipation of litigation and retrospectively valuing the property at the time of the sale. The MSA expressly provides that an appraisal at the time of the buyout or sale would determine the parties' one-half shares of the equity. Only one appraisal was obtained at the time of the buyout, that being the

bank's $300,000 appraisal. There was discussion, but no firm resolution, of whether settlement costs[1] should be borne equally by Husband and Wife under the MSA's alternate disposition provisions. We find that the MSA does not so provide. Finally, Husband made a claim for attorneys' fees in the amount of $1,500 pursuant to Section 6.06(c) of the agreement, which the trial court refused since he was unsuccessful below.

Hence, we reverse and remand. We direct the court to award Husband $42,398.32 for his one-half equity share in the marital home and his counsel fees in litigating this matter.

Order reversed. Case remanded for further proceedings in accordance with this adjudication. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/15/2014

---

[1] The HUD-1 Settlement Statement was introduced into evidence as Wife's Exhibit 3. While it reflects that $8,018.30 was due from Borrower at settlement, $4,743.72 of those settlement costs consisted of Borrower's initial deposit for escrow of homeowner's insurance, property and school taxes, and $3,465.00 for the mortgage insurance premium.